# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2020

Lyle W. Cayce
Clerk

No. 18-60606

STATE OF TEXAS; GREG ABBOTT, *Governor of the State of Texas*; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; SIERRA CLUB,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW WHEELER, *Administrator of the United States Environmental Protection Agency*,

*Respondents*.

On Petitions for Review of Final Action of the
United States Environmental Protection Agency

Before CLEMENT, ELROD, and DUNCAN, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

The State of Texas and Sierra Club challenge the Environmental Protection Agency's action designating Bexar County, Texas as in nonattainment and three neighboring counties as in attainment with the 2015 Ozone National Ambient Air Quality Standards (NAAQS). In 2018, EPA modified Texas's designation of Bexar County from attainment to nonattainment. Texas challenges this action on the basis that the State's

modeling projected the county to be in attainment by the year 2020. Sierra Club insists that EPA should have designated three of Bexar's neighboring counties (Atascosa, Comal, and Guadalupe) as nonattainment because they impacted more than one percent of Bexar's ambient ozone levels. Because the relevant statutory language grants EPA discretionary authority to make the changes it "deems necessary," and because EPA's interpretation and implementation of the statute is reasonable, we DENY both petitions.

I.

A.

Ground level (or ambient) ozone is associated with negative health effects, such as decreased lung function and respiratory symptoms. *See Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 147 (D.C. Cir. 2015) (citation omitted). It can also have detrimental effects on trees, vegetation, and crops, as well as indirect effects on soil, water, and wildlife. *Id.* Ozone forms when nitrous oxides and volatile organic compounds react with sunlight. Because states cannot regulate sunlight, ozone regulation focuses on "ozone-precursor producers like power plants, industrial compounds, motor vehicles and combustion engines." *Id.*

The Clean Air Act establishes a comprehensive system for protecting the country's air quality. 42 U.S.C. §§ 7401–7671q. In this system, state and federal actors work together to reduce air pollution. The Clean Air Act "requires the Administrator of EPA to promulgate NAAQS for each air pollutant for which 'air quality criteria' have been issued under . . . 42 U.S.C. § 7408." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 462 (2001). "[A]t five-year intervals . . . the Administrator shall complete a thorough review" of the NAAQS and "promulgate such new standards as may be appropriate." 42 U.S.C. § 7409(d)(1). Once EPA designates a NAAQS for a pollutant, "the standards become the centerpiece of a complex statutory regime aimed at reducing the pollutant's atmospheric concentration." *Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 358–59 (D.C. Cir. 2002).

When new standards are issued or old standards are revised, the states and EPA work within the Clean Air Act's structure of cooperative federalism to implement the new standards. Governors must "submit to the Administrator a list of all areas (or portions thereof) in the State, designating [each area] as . . . nonattainment, . . . attainment, . . . or unclassifiable." *Id.* § 7407(d)(1)(A). The Administrator then "promulgate[s] the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable." *Id.* § 7407(d)(1)(B)(i). "In making [those] promulgations . . . the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas" submitted by the states. *Id.* § 7407(d)(1)(B)(ii). "If the Governor fails to submit the list . . . the Administrator shall promulgate the designation that the Administrator deems appropriate for any area . . . not designated by the State." *Id.* If EPA intends to modify a state's plan, the Administrator must "notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate." *Id.*

An area is designated nonattainment if it "does not meet (or . . . contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7407(d)(1)(A)(i). Nonattainment areas are further classified as marginal, moderate, serious, severe, or extreme, depending on the severity of air pollution. *See* 40 C.F.R. § 51.1303 (2018). The higher a county's nonattainment classification, the more stringent the air planning requirements are to bring the county back into compliance. 42 U.S.C. §§ 7511, 7511a.

Any area that meets the NAAQS for a given pollutant will be designated as attainment. 42 U.S.C. § 7407(d)(1)(A)(ii). If an area "cannot be classified on the basis of available information as meeting or not meeting the [NAAQS] for the pollutant," it is designated unclassifiable. *Id.* § 7407(d)(1)(A)(iii). EPA considers an "area designated as either

attainment, unclassifiable, or attainment/unclassifiable" to be an "[a]ttainment area." 40 C.F.R. § 51.1100(g) (2015).

For the 2015 ozone NAAQS, attainment is met "when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration . . . is less than or equal to 0.070 ppm." 40 C.F.R. pt. 50, Appx. U(4)(a) (2015). EPA requires states to submit "an annual monitoring network plan which shall provide for the documentation of the establishment and maintenance of an air quality surveillance system." 40 C.F.R. § 58.10(a)(1) (2016). This system uses air monitoring stations to gather air quality data. Where monitoring stations are located depends largely upon population. This means that many counties with fewer than 350,000 residents have no monitoring station. *See* 40 C.F.R. pt. 58, Appx. D, Table D-2 (2016).

Counties with no monitoring stations can still be designated nonattainment if they "contribute[] to ambient air quality" in a nearby nonattainment area. 42 U.S.C. § 7407(d)(1)(A)(i). EPA evaluates the contribution of such counties to neighboring nonattainment counties using a five-factor balancing test that considers: (1) air quality data; (2) emissions and emissions-related data; (3) meteorological data; (4) geography/topography; and (5) jurisdictional boundaries. *See* Janet G. McCabe, Acting Assistant Administrator, *Area Designations for the 2015 Ozone National Ambient Air Quality Standards*, Attachment 3 (Feb. 25, 2016).

Once a county has been designated nonattainment, the state has "the primary responsibility for assuring air quality within" its borders. 42 U.S.C. § 7407(a). The state must develop a state implementation plan (SIP) that "provides for implementation, maintenance, and enforcement" of the unattained standard. 42 U.S.C. § 7410(a)(1). At that point, "the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter." 42 U.S.C. § 7410(k)(3).

B.

In 2015, EPA revised its ozone NAAQS from 0.075 ppm to 0.07 ppm. National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015). Texas submitted the required initial designations for its counties. Because Bexar County's monitors reported a certified 2013–2015 design value of 0.078 ppm, Texas recommended that it be designated nonattainment. For seven of Bexar's neighboring counties (including Atascosa, Comal, and Guadalupe counties), Texas recommended a designation of "unclassifiable/attainment." One year later, Texas asked EPA "to allow the state more time to show that additional data and considerations" warranted an attainment designation for Bexar County. In February 2018, the Texas governor wrote EPA to assert that "Bexar County is projected to satisfy the 2015 NAAQS by 2020, and that projected compliance is sufficient to support an attainment designation."

EPA rejected Texas's revised designation. It called for public comments, which Texas, Sierra Club, and Environmental Defense Fund submitted. In July 2018, the Administrator promulgated the final designations for the eight counties in the San Antonio region. *See* Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards—San Antonio, Texas Area, 83 Fed. Reg. 35,136–01 (July 25, 2018). The agency designated Bexar County as a marginal nonattainment area "based on air quality monitoring data from the 3 most recent years of certified data, which are 2015–2017." 83 Fed. Reg. at 35,138–39. The other seven neighboring counties were designated as attainment/unclassifiable after EPA conducted its five-factor contribution analysis. 83 Fed. Reg. at 35,140.

Texas and Sierra Club timely filed petitions for review. Texas sought review in this court, while Sierra Club sought review in the D.C. Circuit. Texas filed an opposed motion in this court to confirm venue. The D.C. Circuit consolidated the challenges and placed them in abeyance pending this court's resolution of the venue motion. This court granted Texas's motion

to confirm venue.  The D.C. Circuit then granted Texas's motion to transfer the consolidated cases to this court.  Sierra Club continues to oppose venue in this court.[1]

## II.

We first address whether venue is proper in the Fifth Circuit and conclude that it is.

## A.

The Clean Air Act's venue provision provides for judicial review of agency actions in either the D.C. Circuit or the "appropriate circuit," meaning the circuit within which the agency's action applies.  42 U.S.C. § 7607(b)(1).  We have previously explained that § 7607(b)(1) is a "two-fold provision" that is both "a conferral of jurisdiction upon the courts of appeals" and a requirement that "delineates the appropriate venue for challenges."  *Texas v. EPA*, 829 F.3d 405, 418 (5th Cir. 2016).

According to the Act's venue scheme, challenges to actions which are "locally or regionally applicable" belong in the appropriate regional court of appeals.  On the other hand, venue lies exclusively in the D.C. Circuit under one of two conditions: first, if the petition seeks review of an "action of the Administrator in promulgating any [NAAQS] . . . or any other *nationally applicable* regulations promulgated, or final action taken, by the administrator"; or second, if the challenged action, although locally or regionally applicable, "is based on a determination of nationwide scope or effect *and* in taking such action the Administrator finds and publishes that

---

[1] Both Texas and Sierra Club have properly intervened in the other's petition, and Sierra Club is joined in its intervention by the Environmental Defense Fund.  Sierra Club has standing to pursue its challenge.  It has submitted affidavits from members who live and work in the San Antonio area and enjoy the area's recreational activities.  Environmental Defense Fund also has associational standing based on similar affidavits from members who live in San Antonio and participate in outdoor activities.  *See Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019).

such action is based on such a determination." 42 U.S.C. § 7607(b) (emphasis added).

The court—not EPA—determines both the scope of an action's applicability and whether it was based on a determination of nationwide scope or effect. *See Texas*, 829 F.3d at 420–21 (noting that the statute uses clear language and that the statutory text does not confer authority on the Administrator to make these determinations); *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455–56 (D.C. Cir. 2013) (according EPA no deference in determination that rulemaking was not nationally applicable).

B.

Sierra Club contends that venue lies in the D.C. Circuit because the San Antonio designations are part of a "nationally applicable regulation" and because the Administrator acted arbitrarily and capriciously by failing to make a publication to that effect. Texas and EPA respond that venue is appropriate in this court because the designations are only "locally or regionally applicable" and the EPA did not publish a finding that they were based on a determination of nationwide scope or effect. The latter are correct.

This case involves a locally or regionally applicable action. That action is EPA's final designation of Atascosa, Bexar, Comal, and Guadalupe counties as attainment or nonattainment. *See* 83 Fed. Reg. at 35,136. This action is "locally or regionally applicable" because it is directed only at four contiguous Texas counties. *Compare Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011) (holding that agency action affecting thirteen states that spanned seven federal circuits was nationally applicable), *with Am. Road & Transp. Builders Ass'n*, 705 F.3d at 455–56 (holding that agency action concerning a California SIP was locally or regionally applicable).

Locally or regionally applicable actions are limited to the D.C. Circuit only when the action (1) is "based on a determination of nationwide scope or

effect" *and* (2) "the Administrator finds and publishes that such action is based on" a determination of nationwide scope or effect. 42 U.S.C. § 7607(b)(1). Here, the Administrator published no such determination. When the Administrator does not announce that an action is based on a determination of nationwide scope or effect, "the exception transferring venue to the D.C. Circuit does not apply." *Texas*, 829 F.3d at 420 n.17.

Relying on a concurring opinion from another circuit, Sierra Club contends that EPA's failure to publish a nationwide scope or effect determination was "arbitrary and capricious." *See Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 891 F.3d 1041, 1053 (D.C. Cir. 2018) (Silberman, J., concurring). That argument does not comport with the text of the statute or this circuit's precedent. This court "independently consider[s] whether the Administrator *has published* a suitable finding." *Texas*, 829 F.3d at 420 n.17 (emphasis added). Arbitrary and capricious review does not govern the question of whether the EPA *should have published* a nationwide-scope-or-effect determination without any legal requirement to do so.

The Clean Air Act allows EPA to direct regionally applicable actions that are "based on a determination of nationwide scope or effect" to the D.C. Circuit. The Act does not require EPA to send such cases there. Instead, locally or regionally applicable actions are properly before the regional circuits unless the action is both "based on a determination of nationwide scope or effect" *and* "the Administrator finds and publishes" such a conclusion. 42 U.S.C. § 7607(b)(1). Sierra Club's reading gives no independent meaning to the text's conditioning venue on whether "the Administrator finds and publishes" a nationwide conclusion. *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) (observing that "one of the most basic interpretive canons" is "that a statute should be construed so that effect is given to all its provisions") (internal quotation marks and modifications omitted).

Under Sierra Club's reading, there would be no need for "the Administrator [to] find[] and publish[]" its determination. *See* 42 U.S.C. § 7607(b)(1). The court already independently determines whether an action actually was "based on a determination of nationwide scope or effect." *Id.* If Congress desired courts, and not the agency, to be the final adjudicator, it would have left out entirely the requirement that "the Administrator find[] and publish[]" its determination. To Sierra Club's "proposal, the short answer is that Congress did not write the statute that way." *Corley*, 556 U.S. at 315 (internal quotation marks and modifications omitted). Instead, Congress instructed that regional actions based on national determinations are directed to the D.C. Circuit if and only if "*the Administrator* finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1) (emphasis added).

The Act "gives EPA discretion to transfer venue" when the nationwide scope or effect condition is satisfied. *Texas*, 829 F.3d at 421. Congress similarly gave EPA discretion to send such actions to the regional circuits—and EPA exercises that discretion when it declines to "publish[] that such action is based on such a determination." 42 U.S.C. § 7607(b)(1). That decision is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2); *Texas*, 829 F.3d at 425 (explaining that the "standard of review of Clean Air Act actions tracks standards provided by Administrative Procedure Act, 5 U.S.C. § 706"). A court may compel purportedly withheld action (here, the failure to publish a nationwide finding) only when the action is "legally *required*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

The Clean Air Act might read that way if it said that the Administrator *must* publish its determination when it so finds. Instead, the Act says that venue is limited to the D.C. Circuit "*if* in taking such action the Administrator finds and publishes" that determination. 42 U.S.C.

§ 7607(b)(1) (emphasis added). That is not the language of legal obligation. *Cf. Norton*, 542 U.S. at 63 (observing that the APA's authorization for courts to "'compel agency action unlawfully withheld'" "carried forward the traditional practice" of the writ of mandamus, which was normally issued only where "an official had no discretion whatever") (internal quotation marks and alterations omitted) (quoting 5 U.S.C. § 706(1)).

Congress's scheme also makes sense. All nationally applicable actions go to the D.C. Circuit, which promotes national uniformity. All locally or regionally applicable actions that are based on local and regional determinations go to the regional circuits, which promotes responsiveness and attention to local and regional diversity. For the hybrid type of actions— locally or regionally applicable actions based on determinations of nationwide scope or effect—Congress gave the EPA Administrator, as the nation's national regulator, discretion to decide. The way EPA communicates that decision is the publication (or lack of publication) of its determination. And that message (whether it is published, or not) instructs petitioners where to seek judicial review. Sierra Club's reading does violence to that statutory scheme.

Courts decide whether an action is locally applicable and whether an action is based on a national determination. But when a locally applicable action is based on a determination of nationwide scope or effect, the EPA has discretion to select the venue for judicial review. When EPA directs judicial review of an appropriate agency action to a regional circuit instead of the D.C. Circuit, Congress has entitled neither Sierra Club nor federal courts to second-guess that decision.

### III.

We next turn to Texas's challenge to EPA's designation of Bexar County as a nonattainment county. The main dispute between Texas and

No. 18-60606

EPA is whether EPA had the statutory authority to change Texas's recommended designation of Bexar County from attainment to nonattainment. Texas maintains that the Clean Air Act authorizes such a change only when it is "necessary," meaning that it is unavoidable and must be done, and that it was not necessary here. EPA counters that the statute authorizes changes that "the Administrator deems necessary," which grants discretionary authority to EPA to make such determinations and that, in any event, EPA did not err in its determination. We agree with EPA.

A.

Under the Administrative Procedure Act, we will set aside an EPA action that is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) (quoting *Sun Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir. 1983)); 5 U.S.C. § 706(2). To make that determination, we look to whether EPA has provided a "satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

This court applies the familiar *Chevron* framework to questions involving EPA's interpretations of the Clean Air Act. *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003), *as amended on denial of reh'g and reh'g en banc* (Jan. 8, 2004) (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984)). First, the court asks "whether Congress has directly spoken to the precise question at issue" or whether, instead, the statute is ambiguous. *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 392 n.10 (5th Cir.

2014) (quoting *Chevron*, 467 U.S. at 842–43)).  We use traditional tools of construction, focusing on statutory text, context, structure, and history.  *See id.*  Where the statute is unambiguous, the inquiry ends.  *Chevron*, 467 U.S. at 843.  However, if the court determines the statute is ambiguous, we ask if the agency's interpretation is "based on a permissible construction of the statute."  *Id.*  Next, we ask if the agency's interpretation is "based on a permissible construction of the statute."  *Id.*  If the construction is reasonable, the court must accept it, "even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)).  "Federal courts accord 'great deference' to the EPA's construction of the [Clean Air Act]."  *Luminant Generation Co. v. EPA*, 714 F.3d 841, 851 (5th Cir. 2013) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 266 (1976)).

## B.

We begin by noting that Texas does not deny that, for the relevant 2015–17 period, Bexar County did not comply with the 2015 NAAQS.  Instead, the state argues that it, not EPA, is tasked with determining a county's attainment status and that Bexar County would have reached attainment by 2020 without a change in designation.  EPA's role is merely clerical in promulgating the state's designation unless it is "necessary" to change it.  Here, Texas argues that EPA should have accepted the state's designation, which was based partly on monitoring data and partly on future modeling data, because it was not necessary to make a change.

Importantly, the Clean Air Act establishes a system of "cooperative federalism." *Texas*, 829 F.3d at 428 (quoting *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012)).  The state's role at the attainment designation phase is to make "initial designations."    42 U.S.C.

§ 7407(d)(1)(A).  Once that is complete, EPA notifies the state of any contemplated modifications, gives time for appropriate comments, and then promulgates a final designation.  EPA "may either promulgate [the initial designations] as submitted or modify them as it 'deems necessary.'" *Miss. Comm'n*, 790 F.3d at 146 (quoting 42 U.S.C. § 7407(d)(1)).  At that point, the state takes the final designations and crafts a SIP detailing how the state plans to achieve attainment within a specified time frame. *See id.*; *Texas*, 829 F.3d at 411.  EPA, not the state, has the primary responsibility for promulgating attainment designations under the Clean Air Act.  The State has primary responsibility for creating the SIP. *Texas*, 829 F.3d at 411.

The state's first argument leads us to the first step of our *Chevron* analysis.  We must determine whether "Congress has directly spoken to the" question of when EPA may modify a state's proposed attainment designations. *Chevron*, 467 U.S. at 842–43.  Texas contends that Congress has expressly cabined EPA's authority to alter initial designations to cases where it is "necessary" to do so.  The state focuses on the meaning of the word "necessary," arguing that it unambiguously means "inescapable" or "compulsory."  Under this reading, EPA can alter a proposed designation only when it is essential to do so.  EPA counters that the statute grants the Administrator discretion to make changes whenever it "deems necessary."  Therefore, Congress has given the agency discretion to determine when changes are necessary, not merely authority to make changes when it has no other option.  EPA has the better reading of the statute.

"As this is a question of statutory interpretation, we begin with the text of the statute." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019).  After a state makes its initial attainment designation, the Clean Air Act states that the EPA "Administrator may make such modifications as the Administrator *deems* necessary" before promulgating the designations. 42 U.S.C. § 7407(d)(1)(B)(ii) (emphasis added).  The Act "says nothing of

what precisely will render a modification 'necessary.'" *Catawba Cnty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009). "Under Chevron, we read Congress' silence as a delegation of authority to [the agency] to select from among reasonable options." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 515 (2014).

If we were looking at the word "necessary" in isolation, we might agree with Texas.[2] However, the word does not exist in a vacuum. It is part of a larger scheme, one which grants discretion to the Administrator to make modifications that it "deems necessary." If Congress had said instead that the Administrator may only make changes "when necessary," Texas's argument might have more merit. Because the statute says that the Administrator "may" make changes that it "deems necessary," however, it is clear that Congress has delegated discretionary authority to EPA to determine when adjustments should be made.

We turn, then, to the second step of our *Chevron* analysis: whether EPA's construction of the statute is permissible. We conclude that it is. EPA has determined that a change is necessary when a designation is "inconsistent with the statutory language." 83 Fed. Reg. at 35,138/1. Thus, "any area that does not meet the [NAAQS]" must be designated "nonattainment," even if the state initially designated it as "attainment."

---

[2] Texas cites to several dictionary definitions for the word "necessary," all of which the state argues restrict EPA's discretion by uniformly defining the word as one that does not bestow discretion. *See, e.g.*, 10 *Oxford English Dictionary* 275–76 (2d ed. 1989) (defining necessary as "indispensable, requisite, essential, needful; that cannot be done without); *Merriam Webster's Collegiate Dictionary* 776 (10th ed. 1993) (defining necessary as "of an inevitable nature: inescapable"). These definitions do not change our analysis. "A dictionary definition states the core meanings of a term. It cannot delineate the periphery," and the meanings of common words (which typically have multiple definitions) must be determined in the context in which they appear. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 418–19 (2012).

No. 18-60606

42 U.S.C. § 7407(d)(1)(A).  Texas does not argue that this construction is impermissible, and we agree that it is a reasonable interpretation of the statute.

## C.

With this definition in mind, we next determine whether EPA's decision to change Bexar County's designation was arbitrary and capricious. Because Bexar County was not compliant with the 2015 NAAQS when EPA promulgated its designation, we conclude that the Clean Air Act and the Administrative Procedure Act allowed the change.

Texas does not contend that, at the time of assessment, Bexar County met the 2015 NAAQS.  Instead, they argue that because their projection data indicated that Bexar County *would be* in compliance by 2020,[3]  the county should have been designated as attainment.  EPA's failure to consider the modeling data was, in Texas's view, arbitrary and capricious.  This argument relies on the Dictionary Act, which states that "unless the context indicates otherwise . . . words used in the present tense include the future as well as the present."  1 U.S.C. § 1.  According to Texas, this means that when 42 U.S.C. § 7407(d)(1)(A)(i) says that any county that "does not meet" the NAAQS should be designated nonattainment, what the statute really means is that any county that "does not [now, and will not in the future,] meet" the NAAQS should be designated nonattainment.

According to Texas, even if EPA has discretion to determine when a change is necessary, EPA is required to consider modeling data that is relevant to an area's attainment designation.  If the Dictionary Act compels EPA to designate an area as attainment if it will meet the NAAQS in the

_____

[3] 2020 is nearly over, and neither EPA nor Texas has notified the court whether Bexar County has achieved attainment or not.

No. 18-60606

future, then it would be arbitrary and capricious to ignore that relevant information. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.[4]

We think that the provision of the Dictionary Act cited by Texas does not apply here. The future-tense presumption applies only where context does not indicate otherwise. 1 U.S.C. § 1. Context makes it clear in this case that the designation process considers only the present tense. The text of the Clean Air Act provides that a state must designate an area nonattainment if it "does not meet" the NAAQS. 42 U.S.C. § 7407(d)(1)(A)(i). An area designated as "marginal" nonattainment (such as Bexar County) must then meet the NAAQS within three years. 42 U.S.C. § 7511(a)(1); 40 C.F.R. § 51.1303 (2018). It would be contradictory for EPA to require marginal nonattainment areas to comply within three years if projected compliance within three years triggered an attainment designation.

Texas contends that it would have attained the 2015 NAAQS by the year 2020 without a SIP anyway and that this is the distinguishing characteristic. The state's argument, however, is based not on fact, but on supposition. The statute uses concrete terms: either a county does or does not meet the NAAQS. Even with the best available modeling data, Texas could not be certain of future events and future attainment.[5]

---

[4] Before addressing this argument, we note that Texas did not raise the Dictionary Act in the proceedings before the agency. Typically, this would preclude the state from raising the argument for the first time on appeal. *See United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 36 (1952); *see also Hardman v. Colvin*, 820 F.3d 142, 151–52 (5th Cir. 2016). However, because a court "must consult" the Dictionary Act when dealing with an act of Congress, we will address the Act's applicability to this case. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014).

[5] Indeed, at oral argument, EPA informed us that the then-most recent data for Bexar County indicated that its noncomplying monitors had drifted even further from the 2015 ozone NAAQS.

We therefore conclude that EPA was not required to consider the modeling data in this case and that the Clean Air Act did, indeed, allow EPA to change Bexar County's designation to nonattainment.

IV.

Finally, Sierra Club challenges EPA's decision to designate Atascosa, Comal, and Guadalupe counties as attainment/unclassifiable. It contends that these counties contribute to Bexar County's ozone emissions. According to Sierra Club, EPA's decision was unlawful because it changed its interpretation of "contribution" without adequate explanation and because the agency did not sufficiently articulate its reasons for designating the three counties attainment/unclassifiable. We disagree.

A.

The Clean Air Act requires states and EPA to designate as "nonattainment, any area that . . . contributes to ambient air quality in a nearby area that does not meet" the NAAQS. 42 U.S.C. § 7407(d)(1)(A)(i). To determine whether a given county "contributes" to a nearby nonattainment area, EPA uses a five-factor test. This test assesses: (1) air quality data; (2) emissions and emissions-related data; (3) meteorological data; (4) geography/topography; and (5) jurisdictional boundaries. Sierra Club does not assert that this approach violates the Clean Air Act.

Instead, it argues that in the past, "EPA has consistently found that pollution impacts greater than one percent of the applicable NAAQS constitute a 'significant' contribution to downwind nonattainment." In Sierra Club's view, this past practice establishes a one-percent threshold: If a county's emissions impact more than one percent of a neighboring county's ambient ozone levels, then that county must be designated nonattainment. Because EPA designated all three contested counties as attainment/unclassifiable despite the fact that they are above that one-

percent threshold, Sierra Club contends that EPA has "arbitrarily failed to acknowledge" its deviation from past practice. Citing to *FCC v. Fox Television Stations*, 556 U.S. 502 (2008), Sierra Club maintains that EPA's decision is arbitrary because it changes its interpretation of "contribution" without warning or proper explanation. *See id.* at 515 (explaining that when an agency departs from its interpretation of a statute, the agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy"). This argument fails for several reasons.

First, the text of the Clean Air Act does not require EPA to adopt a one-percent threshold. Indeed, the Act contains no numeric threshold regarding attainment designations whatsoever. Perhaps recognizing this, Sierra Club anchors its argument instead in EPA's interpretation of the separate "Good Neighbor" provision that specifies requirements for SIPs and applies to emissions transferred between different states. *See* 42 U.S.C. § 7410(a)(2)(D). We note that the proposed one-percent threshold does not appear in the text of that provision either.[6] Even if it did, that provision and its interpretation have no bearing on whether EPA must now apply a numeric threshold to its initial attainment designations.

Second, it is not clear that EPA has ever adopted a one-percent threshold for attainment designations. Rather, EPA has successfully used a multi-factor balancing test to assess attainment designations for years. *Cf. Catawba Cnty.,* 571 F.3d at 28. That test has never included numeric

---

[6] Under the Good Neighbor provision, and EPA's related regulations, states that exceed the one-percent level are subjected to additional analysis. They are not automatically considered in violation of the Clean Air Act. EPA considers a state in violation of the Good Neighbor provision only if EPA determines the emission could be reduced in a cost-effective manner. *See EME Homer City Generation*, 572 U.S. at 502–03; Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48,208, 48,253 (Aug. 8, 2011).

thresholds.  Moreover, Sierra Club cites no case law suggesting that EPA is (or should be) bound to any numeric threshold in its contribution determinations.  Nor does Sierra Club point us to cases where EPA employed a one-percent threshold either in lieu of or in addition to its multi-factor analysis.

This is likely because attainment designations are data-intensive, technical, and complex.  "Given significant differences among counties, a direct one-to-one comparison of the data, including the methods used to measure such data, could be inappropriate or even illogical."  *Miss. Comm'n*, 790 F.3d at 169 (internal quotations omitted).  When a multi-factor test is involved, "'discrete data points' are not determinative because elevating them 'ignore[s] the very nature of the . . . test, which is designed to analyze a wide variety of data on a case-by-case basis.'"  *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 336 (D.C. Cir. 2012) (quoting *Catawba Cnty.*, 571 F.3d at 46).  A numeric threshold would not make sense under such a scheme because it would render the other relevant factors suddenly irrelevant upon reaching the threshold.  That would defeat the purpose of considering multiple factors in the first place.

Without the one-percent threshold, Sierra Club's argument essentially becomes that EPA's designation of Atascosa, Comal, and Guadalupe counties as attainment/unclassifiable is at odds with how it has treated similarly situated counties in the past.  This argument might have merit if Sierra Club could show the disparity.  A multi-factor analysis will necessarily lead to different counties receiving different designations based on their individual circumstances.  There is opportunity for abuse of discretion there.  This does not mean that every difference in designation is arbitrary, however.  We agree with the D.C. Circuit that EPA subjects a county to "arbitrarily disparate treatment only if it treat[s] genuinely '*similar*

*counties*' dissimilarly." *Miss. Comm'n*, 790 F.3d at 169 (emphasis in original) (quoting *ATK Launch Sys.*, 669 F.3d at 336).

Sierra Club argues that "EPA's approach to Atascosa, Comal, and Guadalupe Counties is arbitrarily inconsistent with the agency's nonattainment designations for other parts of Texas under the 2008 ozone standard." Specifically, Sierra Club points us to EPA's treatment of Wise County in 2008. At that time, Wise County emissions contributed more than one percent to the ambient ozone levels of Dallas, and EPA designated them as nonattainment. *See id.* at 168.

The Environmental Intervenors declare that the incongruent treatment of the four Texas counties is arbitrary: if Wise County were in nonattainment once it reached the one-percent line, why are Atoscosa, Comal, and Guadalupe counties not treated the same? This argument ignores the fact that EPA also conducted a multi-factor analysis for Wise County, and "no single factor determine[d] a particular designation." *Id.* at 169 (quoting *ATK Launch Sys.*, 669 F.3d at 336). Thus, although Wise County may have contributed more than one percent to the ambient air quality, that was not the dispositive factor. EPA weighed all of the relevant factors in that case and came to a reasoned conclusion.

The contested counties have received identical treatment here. EPA has conducted its five-factor analysis and determined that, although the three contested counties may impact Bexar County's ambient ozone levels more than one percent each, the other factors justify the attainment/unclassifiable designation that the agency gave them. Atascosa, Comal, and Guadalupe Counties have been given the same analytical treatment that Wise County was given in 2008. Though the outcomes are different, that is to be expected given the differences between the currently contested counties and Wise County. Indeed, for EPA to suddenly ignore all factors besides the one Sierra

Club has selected would be more arbitrary because the agency gave Wise County a full and fair evaluation before designating it as a nonattainment county.

We conclude that EPA has not arbitrarily reversed its interpretation of "contribution." In this case, it has acted consistently with its previous practices and interpretations.

## B.

Sierra Club also insists that EPA "failed to articulate a rational connection between the facts in the record and its decision not to designate" the disputed counties as nonattainment. This argument is contradicted by the reasoned analysis provided by EPA at the time it designated these three counties as attainment/unclassifiable based on its five-factor analysis.

EPA analyzed the air quality data for each county, including the locations of the violating monitors in Bexar County and the magnitude of those violations. The agency assessed emissions data, including an emissions inventory, location of point sources, mobile emission sources, and population and traffic growth. It addressed meteorological data using a Hybrid Single Particle Lagrangian Integrated Trajectory model to evaluate wind and air flow patterns and determined that the prevailing winds were more likely to carry particles from Bexar County to two of the three contested counties, not the other way around. The agency explained that geography and topography had little impact on its analysis of the San Antonio region because it "does not have any geographical or topographical features" that significantly affect air pollution transport. Moreover, EPA considered jurisdictional boundaries throughout its analysis. No factor was short-changed, and EPA explained the connections between each data point and the decision it reached.

In short, EPA considered the relevant information and adequately explained its designations of Atascosa, Comal, and Guadalupe counties.

Because our "review is most deferential to the EPA's fact findings, particularly where those findings relate to the EPA's evaluation of scientific data for which the Agency possesses technical expertise," and because we see no reason to question EPA's fact-finding or analysis here, we conclude that EPA's designations of the three contested counties complied with the Administrative Procedure Act. *Texas*, 690 F.3d at 677.

V.

Because this case involves a locally or regionally applicable action under 42 U.S.C. § 7607(b)(1), and because EPA did not find and publish a determination that its designations of the contested Texas counties were based on a determination of nationwide scope or effect, we conclude that venue is proper in this court.

The Clean Air Act allows EPA to modify a state's initial attainment designation whenever it "deems necessary." That language grants EPA discretion to determine when it is necessary to make changes to a state's initial designation. Here, EPA concluded that Texas's designation of Bexar County as "attainment" needed adjustment. Texas's petition is DENIED.

The Clean Air Act also instructs states and EPA to designate counties that contribute to the nonattainment status of neighboring counties as nonattainment. EPA used a permissible, multi-factor analysis to determine that the contributions of Atascosa, Comal, and Guadalupe Counties to Bexar County's ambient ozone levels were insufficient to merit a nonattainment designation. The agency's action was not arbitrary and capricious. Therefore, Sierra Club's petition is also DENIED.